

U.S. Department of Justice

United States Attorney
Eastern District of New York

NS:LKG

271 Cadman Plaza East
Brooklyn, New York 11201

April 10, 2020

<u>By Email and ECF</u>

The Honorable Roslynn R. Mauskopf
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Shaquan Flores
                <u>Criminal Docket No. 15-152 (RRM)</u>

Dear Judge Mauskopf:

      The government respectfully submits this response in opposition to the defendant Shaquan Flores's motion to reduce his sentence of imprisonment to home confinement based on "extraordinary and compelling" circumstances, specifically the COVID-19 pandemic, pursuant to 18 U.S.C. § 3582(c)(1)(A)(i).  (ECF No. 45, the "Petition").  For the reasons set forth below, the government concurs with the Probation Department and respectfully submits that the defendant's motion should be denied.

I.    <u>Background</u>

      On March 12, 2020, the Court sentenced the defendant to 16 months' imprisonment, which was a jointly recommended sentence by the parties, following his guilty plea to violating the terms of his supervised release ("VOSR").  As the Court will recall, it imposed the above-Guidelines sentence because the defendant's breach of the Court's trust was so egregious—he was twice arrested for committing new crimes while on supervised release, and he absconded from the Court for approximately one year.

      The defendant was on supervised release in the first instance for committing a federal felony narcotics offense in Vermont.  He pled guilty in March 2013 and was sentenced to 21 months' imprisonment to be followed by three years of supervised release.  The defendant's federal supervision was transferred to this District in March 2015.

      In February 2017, the defendant's term of supervised release was revoked after he was arrested and charged with assault stemming from a domestic violence incident

involving the mother of his child. He was sentenced principally to time served on that violation with three years of supervised release.

In March 2017, the United States Probation Department ("Probation") sought a modification of the defendant's supervision and requested that he be required to participate in an outpatient drug treatment program. That was because the defendant tested positive for marijuana, and later admitted to smoking marijuana in violation of the terms of his supervision.

Then on November 17, 2017, the defendant committed multiple supervised release violations. He was only caught because he was stopped by police in Vermont—where his offense of conviction stems from—because they suspected him of engaging in narcotics trafficking. An officer observed the defendant drive in and out of several hotels in the area in a manner consistent with drug dealing. Upon questioning, the defendant and his three vehicle occupants stated that they were looking for a hotel in the area and going to Six Flags amusement park. Based on information provided by the trooper who stopped them, their story was not consistent with their movements as they had already passed all hotels and the amusement park prior to being stopped. The trooper also informed Probation that the defendant had been stopped in Rensselaer County (near Albany) on July 4, 2017 for speeding. The defendant did not request permission to travel outside of the District on either of those dates, nor did he notify Probation about his contact with law enforcement. When questioned about his out-of-district travel, the defendant admitted to being in the Albany area, but only to pick up his cousin from the bus terminal.

Despite getting caught, his violations continued. The defendant's contempt for court-ordered monitoring—all of which was supposed to help him along his path of rehabilitation and reintegration into the community—was apparent from his continued criminal conduct while on supervision. On July 18, 2018, the defendant was arrested near Lake George—out of the District yet again without permission—for driving while impaired ("DWI"). The defendant was stopped driving a rental car. His repeated trips out of the district in the direction of, or in, Vermont where his underlying federal narcotics conviction stems from, is troubling, and the Court took note of it repeatedly at multiple status conferences on the VOSR.

Yet the defendant's disrespect and contempt for the law continued. The defendant absconded from the Court for nearly a year. With the VOSR charges pending, the defendant failed to appear on January 31, 2019. The Court subsequently issued a bench warrant for his arrest. The defendant finally appeared on January 24, 2020. And while he was out on the bench warrant he was arrested again, this time in Queens County on November 19, 2019. The defendant was the target of a search warrant executed at the residence he shared with his child's mother. The defendant also happened to be dealing marijuana out of the residence. Pursuant to the search warrant, officers recovered marijuana packaged for sale, a digital scale containing marijuana residue and marijuana packaging materials. This arrest formed the basis for additional VOSR charges.

The defendant ultimately resolved the two pending criminal cases with a guilty plea to driving while impaired on the DWI case, and an adjournment in contemplation of dismissal on the marijuana case. With those cases resolved, the defendant resolved the pending VOSR, which included eight separate charges related to the conduct described above.

Although the guidelines were six to twelve months' imprisonment, the parties jointly recommended a 16-month term of imprisonment with no supervised release to follow. At sentencing the Court made an extensive record for the imposition of the above-Guidelines sentence. The Court took note of the defendant's egregious breach of trust and observed his violations were not mere technical violations. He was twice rearrested while on supervision for new criminal conduct; he travelled outside of the District on multiple occasions, the circumstances for which were indicative of the conduct underlying his offense of conviction; and he faced no additional criminal charges for absconding from the Court for a year. The government suggested (as did Probation), and the Court agreed for the reasons stated on the record at sentencing, that continued supervision would be futile.

In his Petition, the defendant moves the Court to "modify his sentence and immediately release him to home confinement[]" due to the "unprecedented threat of COVID-19." (Petition at 1). The defendant does not assert that he is in a high-risk category that would put him at any kind of particularized risk.

II. Argument

The Court should deny the defendant's motion for compassionate relief under 18 U.S.C. § 3582(c)(1)(A)(i) because he has failed to exhaust his administrative remedies as required by the statute, and, on the merits, the defendant has failed to demonstrate "extraordinary and compelling reasons" warranting the requested relief.

A. The Motion Should be Dismissed For Failure to Exhaust Under § 3582(c)(1)(A)

The defendant concedes that he has failed to exhaust the administrative remedies available to him. Specifically, because the BOP has not moved on the defendant's behalf, and because the defendant has not exhausted his "administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf," he may only proceed in the district court if he can demonstrate a "lapse of 30 days from the receipt of such a request [for compassionate release] by the warden of [his] facility." 18 U.S.C. § 3582(c)(1)(A). The defendant admits that he cannot make this showing. (See Petition at 6.) Because such exhaustion is mandatory, the Court lacks the authority to grant compassionate release at this time, and the defendant's motion should be denied on this basis alone.

1. Legal Framework

A motion for compassionate release under 18 U.S.C. § 3582(c)(1)(A)(i) may be made by either the BOP or a defendant, but in the latter case only "after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." Id. Thus, where a compassionate release motion is brought by a defendant who has not "fully exhausted all administrative rights," the district court "may not" modify his term of imprisonment.

It is important, in this context, to note that § 3582(c)'s exhaustion requirement is statutory, and thus is not the sort of judicially-crafted exhaustion requirement that "remain[s] amenable to judge-made exceptions." Ross v. Blake, 136 S. Ct. 1850, 1857 (2016). By significant contrast, statutory exhaustion requirements "stand[] on a different footing." Id. There, "Congress sets the rules—and courts have a role in creating exceptions only if Congress wants them to." Id. Thus, where a statute contains mandatory exhaustion language, the only permissible exceptions are those contained in the statute. Id.

The plain language of § 3582(c)(1)(A) makes clear that a court "may not" modify a sentence unless, as relevant here, the defendant has first "fully exhausted all administrative rights," with no statutory exceptions. Cf. Fry v. Napoleon Community Schools, 137 S. Ct. 743, 750 (2017) (statute requiring that certain types of claims "shall be exhausted" is a mandatory exhaustion provision for those types of claims). For this reason, this Court lacks the authority to grant a defendant's compassionate release motion absent exhaustion of the administrative remedies, as several courts in this district have held. See, e.g., United States v. Quashie, No. 14-CR-0376 (BMC), 2019 WL 7194211, at *1 (E.D.N.Y. Dec. 26, 2019) (discussing exhaustion requirement under the First Step Act ("FSA") and denying motion on ground that inmate failed to establish "whether he has requested any relief from the warden of his facility or that he has appealed the warden's decision to the Director of the BOP"); United States v. Hernandez, No. 19-CR-834 (PAE), 2020 WL 1445851, at *1 (S.D.N.Y. Mar. 25, 2020) (finding that the compassionate release provisions of the FSA did not apply because "Mr. Hernandez does not appear to have sought any such relief within the BOP, let alone exhausted his administrative remedies"); United States v. Cohen, No. 18-CR-602 (WHP), 2020 WL 1428778, at *1 (S.D.N.Y. Mar. 24, 2020) ("As the Government points out, he is 'manifestly ineligible' for compassionate release and has not exhausted his administrative remedies."); United States v. Gileno, No. 19-CR-161 (VAB), 2020 WL 1307108, at *3 (D. Conn. Mar. 19, 2020) ("As a threshold matter, Mr. Gileno has not satisfied the requirement under 18 U.S.C. § 3582(c)(1)(A) to first request that the Bureau of Prisons file a motion on his behalf and then show that thirty days have passed without any BOP action. As a result, the Court cannot consider his motion to modify his sentence.").[1]

---

[1] But see, e.g., United States v. Zuckerman, No. 16-CR-194, 2020 WL 1659880, at *2 (S.D.N.Y. Apr. 3, 2020) ("[T]he Court holds that Zukerman's exhaustion of the administrative process can be waived in light of the extraordinary threat posed—in his unique circumstances—by the COVID-19 pandemic."); United States v. Perez, No. 17-CR-

4

The only Court of Appeals to have addressed the question has held that exhaustion is mandatory. See United States v. Raia, No. 20-1033, 2020 WL 1647922, at *2 (3d Cir. Apr. 2, 2020) (holding that "any remand" to the district court to consider a compassionate release motion "would be futile" in light of the defendant's failure to exhaust, which "presents a glaring roadblock foreclosing compassionate release").

### 2. Exhaustion Is Mandatory Under the Plain Language of the Statute

Despite the statutory exhaustion requirement, the defendant argues that this Court "need not and should not wait for Mr. Flores to exhaust his administrative remedies." (Petition at 6). The Supreme Court in Ross made clear that, in the context of a statutory exhaustion requirement, "courts have a role in creating exceptions only if Congress wants them to." Ross, 136 S. Ct. at 1857. The plain language of § 3582(c) expressly states: "The court may not modify a term of imprisonment once it has been imposed except" in the circumstances enumerated by Congress in the statute. 18 U.S.C. § 3582(c) (emphasis supplied); see also United States v. Savoy, 567 F.3d 71, 72 (2d Cir. 2009) ("A district court may not generally modify a term of imprisonment once it has been imposed," except pursuant to a statutory grant of authority). The Court cannot excuse compliance with the statutory exhaustion requirement without ignoring the plain language of the statute, which forbids it. Accordingly, the Court should hold, as the statute requires, that it "may not" modify the defendant's sentence under the present circumstances absent exhaustion of the administrative remedies.

### 3. Congress Did Not Intend to Remove the BOP From the Compassionate Release Process

The defendant also argues that the plain language of the FSA suggests that courts may unilaterally excuse failure to exhaust the administrative remedies. (See Petition at 8.) He is wrong.

The substantive provision in § 3582(c)(1)(A)(i), on which the defendant relies, dates to 1984 and was unchanged by the FSA. The procedural provision in § 3582(c)(1)(A) that serves as a gatekeeper for this form of relief also remained unchanged in relevant part between its enactment in 1984 and the FSA. Prior to the FSA, it provided that a district court's authority to grant relief under § 3582(c)(1)(A)(i) or (ii) was predicated on a "motion of the Director of the BOP." See 18 U.S.C. § 3582(c)(1)(A) (2017); 21st Century Department of Justice Appropriations Authorization Act, Pub. L. No. 107–273, § 3006, 116 Stat 1758 (2002) (enacting the last amendment to § 3582(c)(1)(A) before the FSA). Before the FSA, the absence of a motion from the BOP on behalf of an inmate seeking

---

513, 2020 WL 1546422, at *2 (S.D.N.Y. Apr. 1, 2020) (finding that exceptions to the exhaustion requirement apply, emphasizing that the defendant's three week sentence would expire before the exhaustion period ends).

compassionate release was a defect that precluded relief in federal courts. See, e.g., Garafola v. United States, 909 F. Supp. 2d 313, 339 (S.D.N.Y. 2012) (collecting cases).

The FSA modified only the procedural provision in § 3582(c)(1)(A). Rather than requiring a motion from the BOP, § 3582(c)(1)(A), as modified, now permits a federal court to review a request for relief only "after the defendant has fully exhausted all administrative rights to appeal a failure of the BOP to bring a motion on the defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier." 18 U.S.C. § 3582(c)(1)(A); FSA of 2018, Pub. L. No. 115-391, § 603(b), 132 Stat 5239 (2018). Thus, since its inception, § 3582(c) has always made clear that the BOP would play a role in assessing compassionate release applications unless it failed to act within thirty days of a request.

Any claim that Congress intended to provide district courts with broad authority to "create" its own exceptions and vacate lawfully imposed sentences, without any procedural safeguards and without the involvement of the BOP, is baseless. As the text of § 3582(c)(1)(A) and the statutory scheme of the FSA make clear, Congress intended to expedite and make more transparent applications for compassionate release by providing inmates with access to federal courts under certain circumstances. Congress did not intend to give courts the discretion to create their own exceptions to the statutory requirements or to remove the BOP from the compassionate release process. If Congress had intended to do so, it could have said so in the FSA, but it did not. Therefore, a court cannot excuse the requirement of a 30-day period to afford BOP the initial review of the defendant's request.

    4.  <u>The Role of the BOP in the Compassionate Release Process is Critically Important</u>

Despite binding statutory authority against his position, the defendant argues that he should be excused from exhausting the BOP's administrative process because such exhaustion "will almost assuredly exacerbate an already impending public health catastrophe in our jails and prisons." (Petition at 6).

BOP procedures provide that upon receipt of an application for compassionate release, BOP officials at the relevant facility are to conduct an extensive and thorough assessment of, among other things, the inmate's particular conditions of confinement and the stated grounds for release, including, as warranted, the inmate's health. See 28 C.F.R. § 571.62(a); BOP Program Statement 5050.50, Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582(c)(1)(A) and 4205(g), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. This assessment, and the knowledge and expertise of BOP staff, can be of great value to the parties and the Court.

The value of the BOP assessment of petitions for compassionate release remains even amid the evolving COVID-19 national emergency. In light of the seriousness of the current crisis, the BOP has taken significant measures in an effort to protect the health of the inmates in its charge. The BOP began planning for potential coronavirus

6

transmissions in January 2020. At that time, the agency established a working group to develop policies in consultation with subject matter experts in the Centers for Disease Control and Prevention ("CDC"), including by reviewing guidance from the World Health Organization ("WHO"). See https://www.bop.gov/resources/news/20200313_covid-19.jsp.

On March 13, 2010, the BOP announced that it was implementing the COVID-19 Phase Two Action Plan in order to minimize the risk of COVID-19 transmission into and inside its facilities. Id. As of that date, the Action Plan comprised many preventive and mitigation measures, including the following: all incoming inmates were screened, and staff were regularly screened; contractor visits were limited to essential services, while nearly all attorney, social, and volunteer visits were suspended; inmate movements between facilities were extremely limited; and institutions were taking additional steps to modify operations to maximize social distancing. Id. As recently as April 1, 2020, the BOP began implementing its Phase Five Action Plan to decrease the spread of COVID-19, which provides for securing each inmate in every BOP institution to his or her assigned cells/quarters for a period of fourteen days, while still providing inmates access to programs and services that are offered under normal operating procedures, such as mental health treatment and education. See https://www.bop.gov/resources/news/20200331_covid19_ action_plan_5.jsp. Additional details about the steps being taken by the BOP are available on its website at www.bop.gov.

Although some inmates have tested positive for COVID-19 and more surely will in the weeks ahead, the solution is not to exclude the BOP from reviewing applications for compassionate release. There are many challenging factors to consider during this unprecedented pandemic, and BOP should have the opportunity to assess those factors during the statutorily required review period. For example, notwithstanding the current crisis, the BOP must carry out its charge to incarcerate sentenced criminals and to protect the public. It must consider the effect of a mass release on the safety and health of both the inmate population and the public. It must marshal its resources to care for inmates in the most efficient and beneficial manner possible. It must assess release plans, which are essential to ensure that a defendant has a safe place to live and access to health care in these difficult times. And it must consider myriad other factors, including the availability of transportation (at a time that interstate transportation services often used by released inmates are providing reduced service), and of supervision of released inmates (at a time that the Probation Office has necessarily reduced home visits and supervision).

In addition, the BOP was recently granted wider authority to designate inmates for home confinement. On March 26, 2020, the Attorney General directed the Director of the BOP, upon considering the totality of the circumstances concerning each inmate, to prioritize the use of statutory authority to place prisoners in home confinement. That authority includes the ability to place an inmate in home confinement during the last six months or 10% of a sentence, whichever is shorter, see 18 U.S.C. § 3624(c)(2), and to move to home confinement those elderly and terminally ill inmates specified in 34 U.S.C. § 60541(g). Since that date, the BOP has placed an additional 723 inmates on home confinement as of this filing. See https://www.bop.gov/coronavirus/. Further, § 12003(b)(2)

7

of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, enacted on March 27, 2020, permits the BOP, if the Attorney General finds that emergency conditions will materially affect the functioning of the BOP, to "lengthen the maximum amount of time for which the Director is authorized to place a prisoner in home confinement under the first sentence of section 3624(c)(2) of title 18, United States Code, as the Director determines appropriate."

For all of these reasons, BOP is best positioned to determine the proper treatment of the inmate population as a whole, taking into account both individual considerations as to particular inmates, and more general considerations regarding the conditions and needs at particular facilities. The provision of § 3582(c)(1)(A) prioritizing administrative review therefore makes sense not only in the ordinary case, but also in the midst of this pandemic. As the Third Circuit recently explained:

> We do not mean to minimize the risks that COVID-19 poses in the federal prison system, particularly for inmates like Raia. But the mere existence of COVID-19 in society and the possibility that it may spread to a particular prison alone cannot independently justify compassionate release, especially considering BOP's statutory role, and its extensive and professional efforts to curtail the virus's spread. Given BOP's shared desire for a safe and healthy prison environment, we conclude that strict compliance with § 3582(c)(1)(A)'s exhaustion requirement takes on added— and critical—importance.

Raia, 2020 WL 1647922, at *2 (internal citations omitted). Even if this Court could ignore the mandatory exhaustion requirement, which it cannot, it would be imprudent to prevent the BOP from engaging in the review of compassionate release applications.

The defendant filed the instant motion before the BOP could make an assessment of his suitability for compassionate release. His motion should be denied for this reason alone.

### B. The Defendant's Potential Exposure to COVID-19 Does Not Constitute an Extraordinary or Compelling Reason Warranting the Requested Relief

Even if the Court were to excuse the defendant's failure to exhaust his administrative remedies—which it cannot—his request for relief fails on the merits. The defendant argues that the current COVID-19 crisis constitutes an "extraordinary and compelling reason[]" under § 3582(c)(1)(A)(i), warranting his immediate release from custody, only approximately one month into his 16-month sentence, when he faces no additional supervised release to follow. He is wrong.

1. <u>Applicable Law</u>

If a defendant has exhausted his administrative remedies, as described above, § 3582(c)(1)(A)(i) permits a Court to modify an already imposed sentence upon a showing of "extraordinary and compelling reasons." If a court finds such "extraordinary and compelling reasons," it may "modify a term of imprisonment" when, "after considering the factors set forth in section 3553(a) to the extent that they are applicable," and to the extent a reduction is consistent with the applicable policy statement in the Sentencing Guidelines, the court "finds that extraordinary and compelling reasons warrant such a reduction." Id.; see also United States v. Gotti, 2020 WL 497987, at *2 (S.D.N.Y. Jan. 15, 2020) ("It is important to note that a defendant who meets all the criteria for compassionate release consideration listed above is not thereby automatically entitled to a sentence modification. He is simply eligible for a sentence modification. The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

The United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") and BOP policy have established clear criteria to aid in a court's determination of when compassionate release is appropriate pursuant to § 3582(c)(1)(A)(i). See U.S.S.G. § 1B1.13; see also BOP Program Statement 5050.50 ("Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g)"), available at https://www.bop.gov/policy/progstat/5050_050_EN.pdf. Both the Guidelines and the BOP Program Statement primarily limit compassionate relief to cases of serious illness or impairment, advanced age, or a need to care for a child, spouse, or registered partner. See id.; see also United States v. Traynor, 04-CR-0582 (NGG), 2009 WL 368927, at *1 n.2 (E.D.N.Y. Feb. 13, 2009). As the Court recognized in Traynor, Congress indicated that § 3582(c)(1) "applies . . . to the unusual case in which the defendant's circumstances are so changed, such as by terminal illness, that it would be inequitable to continue the confinement of the prisoner." Id. at *1 (citing Senate Report No. 98–225, 98th Cong., 2d Sess., reprinted in 1984 U.S.C.C.A.N. 3182, 3304).

A defendant seeking relief under § 3582(c)(1)(A) "bears the initial burden to put forward evidence that establishes an entitlement to a sentence reduction." United States v. Greenhut, No. 18-CR-00048 (CAS), 2019 WL 6218952, at *1 (C.D. Cal. Nov. 21, 2019); Cannon v. United States, No. CR 11-048 (CG), 2019 WL 5580233, at *2 (S.D. Ala. Oct. 29, 2019) ("[T]he defendant has the burden to show circumstances meeting the test for compassionate release."); see also United States v. Jones, 836 F.3d 896, 899 (8th Cir. 2016) (same under § 3582(c)(2)); United States v. Hamilton, 715 F.3d 328, 337 (11th Cir. 2013) (same); United States v. Butler, 970 F.2d 1017, 1026 (2d Cir. 1992) ("A party with an affirmative goal and presumptive access to proof on a given issue normally has the burden of proof as to that issue.").

9

2. <u>A Generalized Fear of COVID-19 Is Not a Basis For Release</u>

The defendant's generalized fear of contracting COVID-19 is insufficient to constitute "extraordinary and compelling reasons" warranting release. The defendant is not among the vulnerable population at heightened risk of getting very sick or dying from COVID-19. He is relatively young, and does not claim to suffer from an underlying health issue that would put him at heightened risk.

The defendant also fails to establish, as is his burden, that the BOP is incapable of addressing the pandemic to sufficiently safeguard him. The BOP has implemented national measures to mitigate the spread of COVID-19 within prisons, as discussed above.

The risk of potential exposure to COVID-19 in a BOP facility cannot alone form the basis to release a prisoner who makes a motion for release, particularly in a case such as this one where the defendant is not in a high-risk category. See, e.g., <u>United States v. Cohen</u>, No. 17-CR-544 (NGG) (E.D.N.Y.), Order dated Mar. 25, 2020 (denying compassionate release motion for 48-year-old, white collar defendant housed at FCI Berlin); <u>United States v. Gagne</u>, 2020 WL 1640152, at *5 (D. Conn. Apr. 2, 2020) (denying compassionate release motion where the defendant had not "presented information to show that her specific medical conditions, medications, and conditions of confinement at FCI Danbury are inclined to uniquely and adversely affect her to the degree sufficient to establish 'extraordinary and compelling' reasons," and did not "show[] that the BOP's response to confirmed cases at FCI Danbury has been inadequate from a medical standpoint"); <u>Gileno</u>, 2020 WL 1307108, at *4 (stating that defendant had not shown that BOP plan to address the COVID-19 pandemic was inadequate or that BOP would be unable to manage the outbreak or adequately treat the defendant).

Simply put, <u>all</u> prisoners in the BOP are at some risk of contracting COVID-19. This does not put the defendant, individually, in an extraordinary and compelling situation, and does not warrant a sentence modification.

For the foregoing reasons, the defendant has failed to establish that he is eligible for compassionate release.

3. <u>The Section 3553(a) Factors Counsel Against Release</u>

Even if the defendant could establish "extraordinary and compelling reasons" as to why he should be released—which he cannot—the instant motion should be denied because balancing such reasons against the factors set forth in 18 U.S.C. § 3553(a) clearly demonstrates that requiring the defendant to complete his term of incarceration is warranted. See <u>Gotti</u>, 2020 WL 497987, at *2 ("The court confronted with a compassionate release motion is still required to consider all the Section 3553(a) factors to the extent they are applicable, and may deny such a motion if, in its discretion, compassionate release is not

warranted because Section 3553(a) factors override, in any particular case, what would otherwise be extraordinary and compelling circumstances.").

In his Petition, the defendant does not even address the § 3553(a) factors, let alone argue that they are outweighed by the risks posed by the COVID-19 pandemic. That is likely because all of the applicable § 3553(a) factors counsel against granting his early release. The defendant did more than make "mistakes" as he suggests. (Pet. at 13). He committed crimes on at least two occasions—driving while intoxicated and selling marijuana out of the house he proposes he should be granted release to—he traveled out of the District on at least three occasions without permission, and he absconded from the Court for a year. The suggestion that he should be trusted to serve out the remainder of his sentence on home confinement when he could not even be trusted to abide by the law, remain in the District and return to court when ordered to do so is absurd. The Court remarked at sentencing on the VOSR that the defendant's conduct amounted to more than mere technical violations. His violations were serious. See 18 U.S.C. § 3553(a)(1). Moreover, requiring the defendant to complete his sentence upholds respect for the law and the need for general deterrence. See 18 U.S.C. § 3553(a)(2)(A), (B). Offenders who repeatedly violate the terms of supervision must know that they will face consequences.

The defendant's history and characteristics also counsel in favor of continued detention. See 18 U.S.C. § 3553(a)(1). The defendant's underlying crime of conviction was for narcotics trafficking. His conduct while on supervision suggests that he went back to drug dealing with little effort toward rehabilitation. Additionally, he had a prior violation for domestic violence. For similar reasons, the need for specific deterrence also remains. Given that the defendant is not subject to supervision upon the completion of his custodial sentence, continued incarceration is warranted to discourage him from continuing with a life of crime. This also counsels against early release.

After only about a month into the defendant's 16-month term of imprisonment, the defendant's fear of contracting COVID-19—absent a particularized risk or any other extenuating circumstances—does not outweigh the § 3553(a) factors that led this Court to impose its sentence. Therefore, the defendant's motion for compassionate release should be denied.

    4.    <u>The Probation Department Opposes Release</u>

The government consulted with the Probation Department ("Probation") about its position on the defendant's motion. Probation is opposed to early release for multiple reasons. The defendant has no underlying health issues that put him in an at-risk category; he has a history of noncompliance on supervision; he absconded; and he is not subject to any additional supervised release.

III.    Conclusion

        For the reasons set forth above, the defendant's motion for compassionate release should be denied.

                              Respectfully submitted,

                              RICHARD P. DONOGHUE
                              United States Attorney

                      By:     /s/
                              Lindsay K. Gerdes
                              Assistant U.S. Attorney
                              (718) 254-6155

cc:    Amanda David (by e-mail and ECF)
       Clerk of Court (by ECF)
       Probation Officer Mike Imrek (by Email)